**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| TERRY ELLEN SANDERS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| v. | ) | **1:23-cv-04139-LMM-LTW** |
| | ) | |
| THE CITY OF CLARKSTON, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant City of Clarkston, Georgia, and submits its

Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried

In Support Of Its Motion For Summary Judgment.

## I.    The City of Clarkston

**A.    The City Manager and the Police Department**

1.

Defendant City of Clarkston, Georgia (the "City") is a municipal corporation

located in DeKalb County, Georgia. (Deposition of Plaintiff Terry Sanders ("Pl.

Dep.") at 43:8-17; City of Clarkston, Georgia Charter, Art. I, § 1.01.)[1]

---

[1] Cited excerpts and exhibits from the deposition of Plaintiff Terry Sanders
are attached hereto as Exhibit 1.  This Court may take judicial notice of the Charter,
which is accessible via Municode. See Stewart v. City of Greensboro, Ga., 2020 WL

2.

The City Manager is the chief executive and administrative officer of the city who oversees the day-to-day operations of the City and is responsible for reviewing and approving termination recommendations. (Charter, Art. III, § 3.02(d)(1); Deposition of Robin Gomez ("Gomez Dep.")[2] at 11:6-12:3.)

3.

Christine Hudson, who was born in May of 1961 and is sixty-three years old, has served as the Chief of Police for the City since January 2012, and Harry Hess served as the Assistant Chief between 2019 and April 2022. (Declaration of Christine Hudson ("Hudson Decl.") at ¶¶ 2-3; Declaration of Harry Hess ("Hess Decl.") ¶ 2).[3]

**B.      Relevant City Policies**

4.

The City maintains an Equal Employment Opportunity Policy within its Employee Handbook which prohibits discrimination on the basis of age, race, and

---

1551828, *11, n. 130 (M.D. Ga. Mar. 31, 2020). See https://library.municode.com/ga/clarkston/codes/code_of_ordinances?nodeId=PTI THCH

[2] Cited excerpts and exhibits from the deposition of Robin Gomez are attached hereto as Exhibit 2.

[3] The declarations of Chief Hudson and Assistant Chief Hess are attached hereto as Exhibits 3 and 4, respectively.

any other protected characteristic. (Pl. Dep. at 44:10-46:1; Pl. Dep. Ex. 4 at p. 6)

5.

The Employee Handbook also prohibits harassment of any employee on the basis of a protected characteristic. (Pl. Dep. Ex. 4 at pp. 8-10, Ch. 1-1, 1-2, and 1-3.)

6.

A non-exhaustive list of acts and omissions which can lead to disciplinary actions are listed under "Rules of Conduct," and include failure or refusal to follow oral or written instructions and inefficiency or lack of application in the performance of duties. (Pl. Dep. at 52:12-53:15; Pl. Dep. Ex. 4 at Ch. 10, 10-1.)

7.

Pursuant to the City's pension plan, employees become vested and eligible for pension benefits upon the completion of five full years of employment with the City. (Pl. Dep. at 53:16-55:4; Pl. Dep. Ex. 4 at Ch. 16, 16-1).

## II.    The Plaintiff's Employment with the City

### A.    The Start of Plaintiff's Employment and Supervision by Gomez

8.

Former City Manager Keith Barker offered Plaintiff the position of Special Projects Coordinator on January 10, 2017, and Plaintiff accepted that role on January 10, 2017 as an at-will employee. (Pl. Dep. at 54:17-55:8; Pl. Dep. Ex. 5.)

9.

Plaintiff's initial salary was $50,000. (Pl. Dep. at 55:5-6; Pl. Dep. Ex. 5.)

10.

Following his retirement, Keith Barker was replaced by Robin Gomez, who served as the City Manager from January 2019 to September 2021. (Gomez Dep. at 6:6-10, 13:13-19; Pl. Dep. at 30:5-16.)

11.

Gomez was Plaintiff's supervisor while she continued as the Special Projects Coordinator until December 2020. (Pl. Dep. 60:22-61:22; Gomez Dep. at 13:20-22.)

**B.     Gomez's Alleged Ageist and Racist Statements**

12.

Plaintiff contends Mr. Gomez thought she was a white male before meeting her, but admits that was pure speculation on her part. (Pl. Dep. at 65:15-67:14.)

13.

Gomez denied forming any opinion about Plaintiff's skin color, race, or age prior to meeting her in person. (Gomez Dep. at 72:7-10.)

14.

During the two year period that Plaintiff was supervised by Gomez, he never made any racist or ageist comments that were directed at Plaintiff.  (Pl. Dep. 48:4-51:6, 67:18-69:24).

- 4 -

15.

Plaintiff claims Mr. Gomez was dismissive after they met, but admits she was not given any disciplinary action while working for Gomez. (Pl. Dep. at 67:9-14.)

16.

By December 2020, Plaintiff's salary had increased to $57,368.17 annually, or $2,206.47 per standard pay period. (Declaration of Dan Defnall ("Defnall Decl.") ¶¶ 6, Ex. A; Pl. Dep. 71:22-72:14, Pl. Dep. Ex. 6).[4]

17.

Mr. Gomez was 51 years old at the time of his deposition, testified that he does not hold any bias over people over the age of forty (40), that his national origin is Mexican, and that his ethnicity is Hispanic. (Gomez Dep. at 9:3-10:10.)

18.

According to Plaintiff, in Spring 2019, Mr. Gomez stated that he believed the DeKalb County Commissioners were incompetent because they are black, and that in the summer of 2019, Mr. Gomez said something about receiving poor service from a black waiter. (Pl. Dep. at 48:22-49:2, 49:22-50:1, 50:7-11; Doc. 7 at 23-24.)

19.

Plaintiff was not a DeKalb County Commissioner at the time and was not the waiter that Mr. Gomez was allegedly referring to. (Pl. Dep. at 50:21-51:5.)

---

[4] The Declaration of Dan Defnall is attached hereto as Exhibit 5.

20.

Plaintiff also contends that on unidentified occasions, when she referred to herself as an "African American," Mr. Gomez said something to the effect of, "You mean Black?" (Pl. Dep. 63:8-64:15).

21.

Plaintiff is unable to identify any African Americans employees other than herself who were terminated by Mr. Gomez. (Pl. Dep. 70:12-14).

22.

Regarding Plaintiff's allegation that Mr. Gomez once stated in the Summer of 2019 that the City's refugee population "don't like you blacks that were born here, they think that you all are lazy and not as smart as they are," Mr. Gomez testified:

> That's probably a comment I would have stated, but in explaining observations that I observed and comments from refugees and immigrants to me directly, especially knowing that I am Hispanic and also a member of a minority group … I would hear from quite a few of our residents who identified as refugees or immigrants who stated, "We don't seem to get along" -- the comments as they're written here, that they don't like blacks born in the U.S. because they don't have the same work ethic and they appear to be lazy … but I'm simply restating comments that I've heard for at least 27 of the 30 years that I've been working in the four cities…It's an opinion I've restated of thousands of other people communicated to me. **I don't believe this in any shape, way, or form.**

(Gomez Dep. at 22:10-16, 22:20-23:7, 23:19-23; Doc. 7 at 24).

23.

Plaintiff never made a complaint of discrimination or harassment to Gomez

or the City Council prior to her termination. (Pl. Dep. at 46:13-20.)

## C.     The Plaintiff's Transfer to the Police Department

24.

Prior to January 2021, the City of Clarkston Police Department did not have much of a social media presence.  (Hess Decl. ¶ 3; Hudson Decl. ¶ 4).

25.

Around that time, Hess and Chief Hudson discussed their belief that the Department would benefit from a greater social media presence and from more community outreach, particularly in light of the civil unrest associated with the murder of George Floyd in May 2020 and related protests against police departments.  (Hess Decl. ¶ 3; Hudson Decl. ¶ 4).

26.

As a result, a new civilian position for a "Community Relations Specialist" was created for the Police Department, and on January 4, 2021, Plaintiff was transferred to this new position.  (Hudson Decl. ¶¶ 4-5; Gomez Dep. 27:5-28:7; Pl. Dep. Ex. 6.)

27.

While Plaintiff contends this was a "demotion," it was  lateral move and she actually received a raise from $57,368.17 to $59,089 annually, or to $2,272.66 per pay period (up from $2,206.47 per pay period) as reflected in her payroll records and

a contemporaneous employee action form. (Pl. Dep.  at 58:1-13, 76:16-22; Pl. Ex. 6; Defnall Decl. ¶¶ 5-6; Hess Decl. ¶ 4; Hudson Decl. ¶ 5.)

28.

While Plaintiff alleges that Hudson, Hess, and Gomez conspired to set her up to fail in this new role, each of those witnesses denies having any communications about any desire or plan to set Ms. Sanders up to fail, to discriminate against her because of her race or her age, to subject her to retaliation, or to terminate her before her pension benefits could vest.    (Pl. Dep. at 90:14-18; Hess Decl. ¶ 4; Hudson Decl. ¶ 5; Gomez Dep. at 28:8-20.)

29.

Plaintiff admits she did not see or hear anything about an alleged conspiracy to terminate her. (Pl. Dep. at 91:9-21.)

30.

When Plaintiff was transferred, she reported directly to then Assistant Chief Harry Hess. (Hudson Decl. ¶¶ 5; Hess Decl. ¶ 4; Pl. Dep. 76:23-77:15.)

31.

Neither Hess nor Hudson ever made any comments, jokes, or statements about Plaintiff's race, age, or pension benefit status. (Pl. Dep. at 83:19-21; Hess Decl. ¶ 13; Hudson Decl. ¶ 11.)

**D.      Events Leading to Plaintiff's Termination.**

32.

Despite filling the position of Community Relations Specialist, Plaintiff seemed in the opinions of Chief Hudson and Assistant Chief Hess to lack knowledge regarding the City and community she was working for, was often defiant and argumentative, appeared to struggle with social media technology, and was lacking in both originality and timeliness.  (Hess Decl. ¶ 5; Hudson Decl. ¶ 6).

33.

On February 4, 2021, Plaintiff was issued a Disciplinary Action Recommendation and a one day suspension after she sent, without approval, a flyer for a "Coffee with a Cop" event to be posted on social media despite the fact that she was instructed to obtain the approval of Hess and Hudson prior to posting. (Hudson Decl. ¶ 7, Ex. B; Hess Decl. ¶ 6, Ex. B; Pl. Dep. 79:5-81:25, 82:24-83:1).

34.

The following day, Plaintiff was issued a Disciplinary Action Recommendation issued by Hess, in which he addressed multiple issues, including the following: (1) Plaintiff's failure to timely to timely comply with a January 7, 2021 directive to create a list of all apartment complexes within the City as well as their property manager and owner, which she had not done by January 19, 2021, which Hess felt displayed a lack of urgency and an inability to follow directions; (2)

- 9 -

Plaintiff's suggestion on January 9, 2021, that instead of getting her a new embroidered shirt to wear for her position, she should just get a name tag, despite the fact that Hess had already told her that the plan was to embroider shirts, which he felt was defiant; (3) Plaintiff's failure, on January 21, 2021, to promptly report to him or the Chief that the AJC had reached out to her to obtain information for a story they were working on; and (4) Plaintiff's delaying until February 2, 2021 to provide Hess with a survey they initially discussed on January 4, 2021, which Hess felt was unoriginal because it was virtually identical to a survey created by the DOJ in 2014. (Hess Decl. ¶ 7, Ex. C; Pl. Dep. 91:24-98:3; Pl. Dep. Ex. 8).

35.

On February 12, 2021, Hess issued a disciplinary action for Plaintiff's failure or refusal to follow oral or written instructions because she submitted a weekly report to Mr. Gomez despite specific orders not to, resulting in a two-day suspension. (Pl. Dep. Ex. 98:6-100:5, Pl. Dep. Ex. 9; Hess Decl. ¶ 8, Ex. D.)

36.

Hess issued written counseling to Plaintiff yet again on February 25, 2021, after he determined that she prepared a list of home-owners associations that included five properties which were not even located within the City limits – which he felt demonstrated an unfamiliarity with the City – as well as for recommending partnering with a Latino organization in connection with a domestic violence

program despite the fact that the City does not have a significant Latino population. (Hess Decl. ¶ 9, Ex. E; Pl. Dep. 101:18-107:5; Pl. Dep. Ex. 10).

37.

None of Plaintiff's disciplinary action forms from either Hess or Hudson contain any reference to her age or race. (Pl. Dep. 108:19-24; Pl. Dep. Ex's 8-12).

38.

By March 1, 2021, Hess had discussed with Chief Hudson his belief that Plaintiff was not working out and that it was his recommendation to terminate her employment. (Hess Decl. ¶ 11; Hudson Decl. ¶ 12).

39.

The same day, Hess transmitted a memorandum to Gomez outlining a number of Plaintiff's perceived shortcomings and performance issues, including: (1) failing to timely transmit photos for social media posting following a Coffee with a Cop event on February 27, 2021; (2) failing to follow instructions related to a project dealing with illegal parking; (3) Plaintiff's frequent request for assistance with simple tasks; (4) Plaintiff's belated handling of a proposed social media post for Black History Month; and (5) an incident on February 27, 2021 in which it took Plaintiff two hours to email Hess photos from a "Coffee with a Cop" event. (Hess Decl. ¶ 9, Ex. F; Pl. Dep. 108:24-114:12, 116:15-118:8, 118:10-119:6, Ex. 11).

- 11 -

40.

The following day, March 2, 2021, Hudson transmitted a memorandum to Gomez recommending the termination of Plaintiff and noting that since January 4, 2021 she had been suspended for a total of three days for failure to or refusal to follow instructions, had received counseling for untimeliness, lack of originality, and defiance, and further noting her belief that Plaintiff continued to demonstrate a lack of knowledge of the City limits, untimeliness, lack of originality, and incompetence. (Pl. Dep. Ex. 12; Hudson Decl. ¶ 10, Ex. D; Gomez Dep. 31:20-32:8; Pl. Dep. 120:1-121:23, Ex. 12).

41.

Hudson made the recommendation to terminate Plaintiff and Gomez approved the recommendation, and Plaintiff was terminated on March 5, 2021. (Gomez Dep. at 36:14-16; Hudson Decl. at ¶ 10, Ex. D at DEF COC000109; Pl. Dep. Ex. 12.)

42.

There was no mention of Plaintiff's age or race during the termination meeting.  (Pl. Dep. 124:10-125:8).

43.

Plaintiff believes there was a disconnect between herself, the Chief, and the Assistant Chief because they were not used to having a civilian in their ranks, but admits that being a civilian does not have anything to do with race or age. (Pl. Dep.

at 89:8-90:3.)

44.

There is no record evidence that anyone was hired to replace Plaintiff in her former position, let alone a member of a different protected class. (Pl. Dep. 130:22-131:11; Hudson Decl. ¶ 12).

45.

Plaintiff also admitted that she cannot identify anyone who was treated differently by Hess or Hudson under similar circumstances. (Pl. Dep. 140:3-14, **"Q. You don't have an [sic] comparator, do you?" A. "No, but neither do they.";** see also Pl. Dep. at 31:19-32:15, **"there was nobody to really compare because I was the first civilian [in the Police Department]"**) (emphasis in bold).

E.      **The EEOC Charge and the Federal Claims**

46.

Plaintiff's EEOC Charge was signed on May 20, 2021, checked only the boxes for race and age discrimination, contains no reference to "retaliation" or "protected activity," and states that the discrimination occurred between January 4, 2021 and March 5, 2021. (Pl. Dep. at 23:20-25:14, 26:13-27:25, 29:12-18; Pl. Ex. 1.)

47.

Unlike her EEOC Charge, the Complaint filed by Plaintiff on September 14, 2023, alleges the discrimination at issue occurred from January 2019 to March 5,

2021. (Pl. Dep. at 29:12-18; Pl. Ex. 2.)

48.

Plaintiff admits the events from January of 2019 to 2020 occurred more than 180 days before the EEOC Charge was filed, which was on May 20, 2021. (Pl. Dep. at 29:19-21, 29:22-30:1; Pl. Ex.'s 1 and 2.)

49.

Plaintiff believes she was subjected to retaliation because she did not live up to the stereotypical views of African American or black people. (Pl. Dep. at 34:22-35:3; Pl. Ex. 2.)

50.

In response to how she was retaliated against, Plaintiff states she was discriminated against because of her opposition to a practice of her employer that she believed violated the law because she was "being racially profiled and targeted." (Pl. Dep. at 137:6-14.)

51.

Plaintiff also claims there was a motive to deny her a vested pension, but agrees her pension was not going to vest until January 10, 2022, and that she was terminated on March 5, 2021 (ten months prior). (Pl. Dep. at 26:4-8, 83:25-83:15.)

52.

Plaintiff cannot identify any other African American employees who were

terminated before their pension benefits vested. (Pl. Dep. at 85:12-15.)

53.

Plaintiff admits her claim that she was the only employee who had to get permission before posting to social media was speculation. (Pl. Dep. at 85:16-88:5.)

54.

Plaintiff admits she never heard Hudson or Hess make any comment about Plaintiff's race or age. (Pl. Dep. at 83:13-21; 119:7-11.)

55.

Plaintiff further admits she never heard Hudson or Hess make any racist jokes or comments about the ages or skin colors of other people. (Pl. Dep. at 119:12-19.)

56.

Gomez was not aware of when Plaintiff's pension would vest, and this had nothing to do with the decision to terminate Plaintiff. (Gomez Dep. at 37:22-25.)

57.

Chief Hudson's and Assistant Chief Hess's recommendation to terminate Plaintiff also had nothing to do with her age, race, pension status, or any alleged protected activity.  (Hudson Decl. ¶ 11; Hess Decl. ¶ 13).

Respectfully submitted, this 5th day of August 2024.

**FREEMAN MATHIS & GARY, LLP**

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
Anna C. Perry
Georgia Bar No. 306362
*Attorneys for Defendant*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960
E: jbennett@fmglaw.com
E: anna.perry@fmglaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **TERRY ELLEN SANDERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **1:23-cv-04139-LMM-LTW** |
| | ) | |
| **THE CITY OF CLARKSTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I have this day filed the **DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, and that I have additionally served Plaintiff by email and mail as follows:

Terry Ellen Sanders
2220 Burr Court
Buford, GA 30518
Tsanders2830@gmail.com
*Plaintiff*

This 5th day of August, 2024.

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
